IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COSONIA SPRAAGS,              )
                             )
        Plaintiff,           )
                             )        Case No. 11 C 1026
    v.                       )
                             )        Judge Joan H. Lefkow
CAROLYN W. COLVIN, [1]       )
Commissioner of Social Security, )
                             )
        Defendant.           )

## OPINION AND ORDER

Cosonia Spraags brings this action under 42 U.S.C. § 405(g) for review of the final

decision of the Commissioner of Social Security ("the Commissioner"), denying her application

for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C.

§ 423. Spraags asks the court to reverse the decision of Administrative Law Judge Regina M.

Kossek ("the ALJ") and to remand this case to the Commissioner for further consideration. The

parties have filed cross motions for summary judgment. For the following reasons, Spraags'

motion (dkt. 30) is denied, the Commissioner's motion (dkt. 33) is granted, and the

Commissioner's decision denying disability insurance benefits is affirmed. [2]

## BACKGROUND

### I.      Procedural Background

On December 19, 2005, Spraags filed an application for disability insurance benefits

alleging an onset date of disability of June 25, 2005. (Administrative Record ("R.") 182-86.)

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin automatically substituted for the former Commissioner, Michael J. Astrue, when she became the Acting Commissioner of Social Security on February 14, 2013. Fed. R. Civ. P. 25(d).

[2] The court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Her application was denied on March 6, 2006 (R. 115-18), and again denied on reconsideration on June 14, 2006. (R. 121-23.) She then requested a hearing before an administrative law judge. (R. 125.) Because Spraags last met the disability insured status on March 31, 2007, she needed to show that she was disabled on or before that date in order to be eligible for benefits. (R. 9.) The hearing commenced on June 25, 2008 and continued on June 17, 2009. On September 2, 2009, the ALJ concluded that Spraags was not disabled during the relevant time period. (R. 9-20.) Spraags timely sought a review of the ALJ's decision, which the Appeals Council denied on December 10, 2010. (R. 1-3.) The ALJ's decision thus became that of the Commissioner. *See* 20 C.F.R. § 404.981.

## II. Factual Background

### A. Pre-Onset Medical Interventions

Spraags was born on January 4, 1972, and was thirty-three years old on her alleged onset date. (R. 182.) Spraags, who has an associate of arts degree, worked as a licensed practical nurse with disabled children for the Chicago Public Schools from 1995 through 2002. (R. 30, 532.) She is right-handed.[3] (R. 533.)

On September 26, 2002, Spraags was injured when a school bus she was on was rear-ended by another bus. (R. 97-98.) Spraags experienced pain on the left side of her body following the accident and four days later she visited Dr. Michelle Jaworski at Combined Orthopaedic Specialists in Oak Brook, Illinois. (R. 471-73.) Dr. Jaworski diagnosed Spraags with patellar contusion, cervical strain, lumbar strain, and shoulder contusion. (*Id.*)

Because of the accident Spraags had to have two surgeries on her left shoulder. On March 26, 2003, she had arthroscopic surgery on her left shoulder to repair a tear and lesion in the shoulder joint. (R. 231, 343, 477.) After a December 2003 MRI revealed another tear, she

---

[3] She testified that she is ambidextrous but writes with her right hand. (R. 31.)

had another surgery to repair the tear and remove inflamed and damaged tissue in January 2004. (R. 382.) She remained under her surgeon's care and in physical therapy until May 10, 2004. (*Id.*) She was released to full duty at her job as a school nurse on July 20, 2004, but returned to limited duty a week later. (*Id.*)

On September 28, 2004, Spraags underwent a functional capacity evaluation to determine whether she could return to work. (R. 787.) She told the evaluators that her pain was a two out of ten at rest, a four out of ten while performing household chores like dishwashing or combing, and a six out of ten when performing "overhead activity." (R. 787-89.) She also reported that she was taking Naprosyn, Vicodin, and Flexeril for pain. (R. 787.) The evaluation found that she was capable of performing work that required up to lifting fifteen pounds with her left arm. (*Id.*) Although Spraags "want[ed] to return to full duty full time," the report concluded that she was "restrictive [*sic*] to light duty" but there was "no light duty available at work." (R. 788.)

**B.      Treatment In Relevant Period (June 25, 2005-March 31, 2007)**

On August 18, 2005, Spraags visited her primary care physician, Dr. Diana Chicos, at Advocate Evergreen Health Center after an allergic reaction to seafood. (R. 570.) She also complained of occasional left shoulder pain and low back pain. (*Id.*) Dr. Chicos performed a physical exam on Spraags and found she weighed 196 pounds, was 5 feet, three and a half inches in height, and had no abnormal results on musculoskeletal or neurological exams. (R. 570-71.) Dr. Chicos prescribed refills for Naproxen (the generic for Naprosyn) and Vicodin. (R. 571.) Dr. Chicos discussed results of a cholesterol test with Spraags a few days later and recommended a low fat diet and exercise. (R. 572-74.) Spraags saw Dr. Chicos again on January 10, 2006. (R. 567.) Dr. Chicos reported that Spraags weighed 201 pounds, complained of neck and shoulder pain, and had a decreased range of motion in her left shoulder due to pain. (*Id.*) She prescribed

physical therapy, refills of Vicodin and Naproxen, and instructed Spraags to go on a low fat diet. (R. 568.)

On January 18, 2006, Spraags began physical therapy with Debbie Biros at Physiotherapy Associates in Evergreen Park, Illinois. (R. 553.) Spraags told Biros she had no pain at the time of the appointment but that she would have muscle spasms in her left upper trapezoid and increased back pain with sitting, standing, or ambulating for more than 15 minutes. (*Id.*) On March 9, 2006, after four physical therapy sessions, Biros reported to Dr. Chicos that Spraags' physical therapy "goals have been achieved and [Spraags] has attained maximum potential with therapy at this time." (R. 554.) Biros reported that Spraags still had pain but it improved after she did her exercises, but then it would "get[ ] tight again." (*Id.*) Biros also reported that Spraags had improved trunk mobility and left shoulder, scapular, and abdominal muscle strength. (*Id.*)

On February 21, 2006, Spraags had a consultative examination with Dr. M.S. Patil, a family practice and emergency medicine physician. (R. 532-35.) The purpose of the exam was solely to provide information to the Illinois Bureau of Disability Determination Service in regards to Spraags' disability claim. (R. 532.) Spraags told Dr. Patil that she had constant "mild to moderate pain" in the left side of her body, including constant pain in the neck, radiating to the left shoulder, arm, and leg. (*Id.*) She also complained of muscle spasms in her left shoulder and back "all day long." (*Id.*) Dr. Patil wrote that Spraags' last orthopedic consult was in September 2004. (*Id.*) Dr. Patil noted she had normal gait, balance, reflexes, strength, and sensation. (R. 534.) In particular, he found that Spraags was able to perform functions such as tying shoelaces, picking up coins, and writing names with no difficulty with her right and left hands. (*Id.*) He

also determined that she had no localized tender trigger points on her body and her gait was normal. (R. 535.)

On March 2, 2006, Dr. Kim Young-Ja, a state agency consultant, performed a residual functional capacity ("RFC") examination . (R. 536-43.) Dr. Young-Ja determined that Spraags could occasionally lift twenty pounds and could frequently lift or carry ten pounds. (R. 537.) He also determined that Spraags could stand or walk about six hours in an eight-hour workday, sit for six hours in an eight-hour day, and also push and pull unlimited amounts. (*Id.*) She could balance, stoop, kneel, crouch, and crawl frequently, but could not climb a ladder, rope, or scaffolds. (R. 538.) The exam also showed she was limited in frequency that she could reach above shoulder level with her left arm, but her gross and fine manipulations were unlimited and she had no other communicative or environmental limitations. (R. 539-40.)

On September 20, 2006, Spraags received emergency treatment for lower back pain at Provident Hospital of Cook County. (R. 557.) The doctor diagnosed a back sprain and prescribed Naprosyn. (R. 559.)

On January 5, 2007, Spraags had her first routine physical exam with Dr. R. Mundackal at Cook County Englewood Health Center. (R. 591.) The ALJ noted that Dr. Mundackal did not perform objective testing at that time. (R. 17.) Dr. Mundackal prescribed Naproxen, Ultram, and Toprol for her pain. (R. 594.) Following the visit, Dr. Mundackal completed a medical statement regarding Spraags' shoulder and RFC exam for Spraags to submit with her disability claim. (R. 576-582.) The medical statement noted Spraags' limited motion, weakness, and pain in both her left and right shoulders. (R. 577.) It also noted joint arthritis in her shoulder joint. (*Id.*) Dr. Mundackal wrote that Spraags could work only two hours per day, that she could stand for two hours at a time and four hours total in an eight-hour work day, and that she could sit for

two hours at a time and four hours total in an eight-hour workday. (*Id*.) The RFC questionnaire, which she completed at the same time, states that Spraags could only sit for thirty minutes at a time and for two hours total in a work day, and could walk or stand for twenty minutes total and less than two hours in a work day. (R. 579-80.) The RFC examination also indicates that Spraags can "rarely" lift or carry less than ten pounds and never anything ten pounds or greater, could occasionally look up and down but rarely turn her head to the right or left or hold her head in a static position, twist, stop, crouch, climb ladders, or stairs. (R. 579-81.) Dr. Mundackal opined that Spraags suffered from severe pain, and he diagnosed her with degenerative arthritis. He found that Spraags was capable of a low stress job because she could move her elbows, wrists, and fingers without pain and had no significant limitations with "reaching, handling or fingering." (*Id*.) Dr. Mundackal thought Spraags' impairments would cause her to be absent from work about four times per month. (R. 581.)

Spraags saw Dr. Mundackal again on January 26, 2007 for reasons unrelated to her disability claim. (R. 585.) Dr. Mundackal wrote in her notes that Spraags suffered from "chronic muskuloskeletal pain" but that she was "asymptomatic today." (*Id*.) Spraags returned to Dr. Mundackal on April 6, 2007, for a check-up.[4] (R. 584.) She complained of pain in her back, shoulder, and left hip. (*Id*.) Dr. Mundackal thus referred her to a pain clinic at Stroger Hospital.[5] (*Id*.)

Spraags underwent her initial assessment at the pain clinic on April 24, 2007. (R. 606.) On her pain assessment form, Spraags said the pain medications she took made her "sleep a lot."

---

[4]  This visit and all subsequent visits are outside of the relevant time frame, as her insurance expired on March 31, 2007. The ALJ, however, stated that she would consider evidence from three to six months outside the relevant time period. (R. 68.)

[5]  Before she went to the pain clinic, Spraags was treated in the emergency room at Oak Forest Hospital on April 17, 2007 but only complained of left knee pain as a result of hitting knee on door a week prior, and a bump under left her ear. (R. 702.)

(*Id.*)  She complained of chronic pain and was instructed to continue taking medication as prescribed.  (R. 608-09.)  Spraags saw Dr. Mundackal again on May 4, 2007, for knee pain (R. 750.)  She saw him two months later, on July 20, 2007, and had her prescriptions refilled but "denie[d] complaints."[6]  (R. 749.)

Spraags continued to complain of shoulder pain, however, and had an MRI of her left shoulder on March 2, 2009 at Mount Sinai Medical Center in Chicago.  (R. 798.)  The MRI was normal but there was not enough contrasting agent in her shoulder to adequately see all possible tears.  (R. 799.)  She thus had a second MRI on April 13, 2009, this time at Advanced Medical Imaging Center in Chicago.  (R. 802.)  The second MRI showed a five millimeter tear in a tendon in her left shoulder.  (*Id.*)

## III.    Evidence Presented To The ALJ

### A.    Spraags' Testimony

Spraags testified at her hearing before the ALJ and was represented by counsel, Kenneth Dobbs.  She explained that she has not held gainful employment since her 2002 bus accident. (R. 31.)  Because she was only released for light work and her former employer, Chicago Public Schools, had no such positions available, Spraags participated in vocational rehabilitation associated with her worker's compensation claim.  (R. 34.)  Spraags believed that at some point prior to March 31, 2007, she was either hired for or about to be hired[7] for multiple positions, such as case manager and teacher's assistant, but each time she would be unable to perform all attendant duties, such as typing or sitting for long stretches.  (R. 34, 37-38.)

---

[6]  In early 2008, Spraags' workers' compensation benefits expired.
[7]  The record is not entirely clear on whether Spraags actually was hired for these positions or whether she was far along in the interview process when she was told she was not selected for the job.

Spraags also explained that she "believe[s]" she was living alone from 2005 until 2007 but "had a lot of assistance" from friends and family. (R. 39.) Her mother would stay with her "for periods of time" and Spraags would occasionally stay with her mother. (R. 39-40.) Spraags testified that she could do a little laundry at a time but she was taking multiple medications and sleeping a lot. (R. 40.) She was also searching for a job as required for her vocational rehabilitation. (R. 44.)

Spraags testified that from 2005 until 2007, her physical health deteriorated. (*Id.*) She testified that she had trouble walking and sitting. (R. 48.) She had neck, shoulder, and leg problems. (*Id.*) She would have spasms from her neck to her shoulder a few time times per week and said her pain was a ten on a scale of one to ten. (R. 49-50.) She also could not drive because stiffness prevented her from turning her neck. (R. 50.) Pain and stiffness would wake her up a few times per week. (R. 51.) Spraags also told the ALJ that she had problems manipulating her hands, and tasks such as picking up coins on a table, buttoning buttons, and typing were difficult if not impossible. (R. 52-53.) She developed problems with her right arm from overuse. (R. 53.) She could not reach overhead with her left arm, and while she could reach it out straight ahead she could not maintain that position. (R. 54-55.)

Spraags also told the ALJ that her insurance ended about seven or eight months prior to seeing Dr. Mundackal. (R. 79.) She was told by the health center at Cook County Hospital that she would have to wait to see a physician, causing Spraags to visit the emergency room instead. (R. 80.) Spraags' attorney conceded there was just one emergency room record, from September 2006. (R. 94.)

## B.    Medical Expert's Testimony

Dr. Hugh Savage, a consultative medical expert, testified that the most useful report to him was the one prepared by Dr. Patil after Spraags' visit on February 21, 2006.  (R. 58.)  This report reflected that Spraags had good motor strength, grip, and balance.  (R. 58.)  Dr. Savage also discussed the notes from Spraags' January 5, 2007 visit with Dr. Mundackal.  Although her pain was noted to be a six out of ten, Dr. Savage noted that the doctor did not add any medication after that visit, which is an indication that "the doctor did not sense that she required more pain medicine" despite her stated pain level.[8]  (R. 59-60.)  Because the ALJ said she would consider evidence within six months before and after the relevant time period to obtain a comprehensive picture of Spraags' claim, Dr. Savage also noted that Spraags was referred to the pain clinic in April 2007 but she did not complain of pain during a July 2007 visit with Dr. Mundackal.  (R. 68.)  Dr. Savage also discussed the MRI Spraags had in March 2009.  He did not discuss the April 2009 MRI, as it was not provided to the ALJ before the hearing.  He explained that because the March 2009 MRI was normal, it was unlikely that Spraags would have had an abnormal MRI during the relevant period.  (R. 62.)

Around the relevant time period, Dr. Savage concluded that Spraags was limited in her ability to raise her left arm above her shoulder and could not have any weight in her hand while doing so.  (R. 68-69.)  Dr. Savage opined that Spraags could stand or walk six hours and sit six hours in an eight hour day.  (R. 69.)  She could lift or carry twenty pounds occasionally and ten pounds frequently, lifting from a lower to a higher level, as long as it was below the shoulder, with help from the other hand.  (R. 69, 75.)  She could also carry five pounds straight ahead.  (R. 75.)  She had limited pushing and pulling abilities with her left arm if her arm was not above her

---

[8]  At this point in the testimony, Spraags interjected that the doctor did send her to the pain clinic, but Dr. Savage pointed out that Spraags was not sent to the pain clinic for another three months.  (R. 60.)

shoulder. (R. 69.) She could not climb ladders, ropes, or scaffolds, but she could balance, stoop, kneel, crouch, or crawl. (*Id.*) She could not take something down from a shelf and put it down if it weighed more than one pound. (R. 74.) Dr. Savage found she had no other limitations. She could reach with her right hand, had no other postural, visual, or communicative limitations, but she should avoid hazardous machinery. (R. 69-70.)

The ALJ asked Dr. Savage about the RFC exam that Dr. Mundackal completed for Spraags on January 12, 2007, noting that it was "pretty inconsistent" with Dr. Savage's conclusions. (R. 71.) For example, Dr. Mundackal suggested that Spraags was much more limited in her ability to sit and stand and had problems with both her right and left shoulders. Dr. Mundackal further stated that Spraags should not raise her left arm above shoulder level. (R. 72.) Dr. Savage testified that to find Spraags limited in such a way, he would have to look for certain swelling in the shoulder but saw nothing of the sort in the record. (*Id.*) Dr. Savage also noted that although Spraags' visit to Dr. Mundackal was less than a year after her visit to Dr. Patil, Dr. Patil had made no such finding. (*Id.*)

### C.    Vocational Expert's Testimony

Dr. Richard Hammersmith, a vocational expert testified that Spraags' previous position as a school nurse was a "medium and a skilled position" and had "some transferable skills to the light and sedentary level." (R. 74.) The ALJ thus asked Dr. Hammersmith what jobs Spraags could hold with the following limitations. She could not lift overhead or straight ahead with her left hand. She could occasionally lift twenty pounds and frequently lift ten pounds with her left arm up to shoulder. She had limited ability to reach with her left arm, she could not take anything down from a shelf over one pound. She had no limitations with her right shoulder and no visual or communicative limitations, but she should avoid concentrated hazards. She could

stand or walk for six hours per day and sit for six hours per day.  (R. 74-75.)  With these

limitations in mind, Dr. Hammersmith pointed to various positions Spraags could hold with these

limitations, such as a hospital admitting clerk (approximately 500 jobs in Chicago and the six

surrounding counties), a medical secretary (approximately 3,000 jobs), or a medical records

auditor (approximately 1,500 jobs).  These are "light level" jobs that are "usually done with the

hands in front of you."  (R. 76.)  He stated it was possible for her to perform electrical assembly

jobs, which involve manipulating but no lifting.  (R. 76.)  There are approximately 8,000 of those

jobs in Chicago and the six surrounding counties.  (R. 77.)  He also pointed to packaging and

testing jobs, with 3,000 and 5,000 positions in the Chicago area, respectively.  (*Id.*)

The ALJ next posed the following hypothetical: sedentary, no mental limitations,

stand/walk two hours per day, sit six hours per day, push/pull limited upper left extremity, no

ladders, no left overhead reaching, no left reaching straight head with weight, lower picking up,

no right side limitations, no visual limitations, no communication limitations, no mental

limitations, and avoiding concentrated hazards.  (R. 77.)  Dr. Hammersmith stated that the same

jobs he already described would be available.  (*Id.*)  The ALJ then asked about the same

hypothetical but unskilled labor.  (*Id.*)  Dr. Hammersmith stated that there are cashier jobs

(approximately 5,000), assembly jobs (approximately 4,000), and telephone solicitor jobs

(approximately 5,000).  (R. 77-78.)  For the sedentary unskilled jobs, employees have to stay on

task between 88 and 90 percent of the time and would be allowed two days of absence per

month.  (R. 78.)  For skilled jobs, employees have to stay on task "probably 90 percent or more"

of the time and would also be allowed up to two days per month absence.  (*Id.*)

### D. Second ALJ Hearing

Spraags appeared with counsel before the ALJ again on June 25, 2008. Dr. Savage attended again, along with a different vocational expert, Grace Gianforte. Gianforte explained that while Spraags was receiving worker's compensation, she was looking for a job through the vocational rehabilitation requirement. (R. 101.) Gianforte explained that means "that a person has achieved medical stability and that they have restrictions, they can't go back to their past job . . . [b]ut there are other jobs that they may be able to perform." (R. 102.) According to Gianforte, Spraags' previous job as a licensed practical nurse was a "medium level of exertion." (R. 107.) Gianforte explained that Spraags had transferrable skills from her work as a nurse to jobs such as referral clerk, appointment clerk, rehab clerk, diet clerk, or social service case aid or human service worker. (R. 107-08.)

## III. The ALJ's Decision

The ALJ considered the evidence before applying the relevant legal standard and determined that Spraags was not eligible for disability benefits because she was not disabled. First, the ALJ determined that Spraags last met the insured status requirements of the Act on March 31, 2007. (R. 11.) Second, the ALJ determined that Spraags did not engage in substantial gainful activity from June 25, 2005, the alleged onset date of her disability, until March 31, 2007. (*Id.*) Third, the ALJ determined that as of her last insured date, Spraags had two impairments: "frozen shoulder," or adhesive capsulitis of her left shoulder (stiffness and pain in the joint) after two repair surgeries, and obesity, which would significantly limit her ability to perform basic work activities. (*Id.*) Fourth, the ALJ found that as of the date last insured, Spraags did not have an impairment or combination of impairments that met or medically equaled an impairment listed in the Listing of Impairments, 20 C.F.R. p. 404, subpt. P, app. 1

("Listing of Impairments"). (*Id.*) She found that Spraags had the following RFC: Spraags could lift/carry twenty pounds occasionally and ten pounds frequently; sit six hours and stand/walk six hours in an eight-hour day; perform limited pushing and pulling with the upper left extremity; perform limited overhead or straight reaching on her left with no weight; and perform unlimited reaching with the right arm. The ALJ also found that Spraags could not climb ropes, ladders, or scaffoldings, and needed to avoid concentrated exposure to hazards, but that she had no other limitations, including no postural, visual, or communicative limitations, and could perform simple, unskilled work. (R. 12.) The ALJ concluded that although Spraags was unable to perform her past relevant work, given her age (35 on the date last insured), education, work experience, transferability of skills and RFC, there were jobs that existed in significant numbers that Spraags could have performed. (R. 18-19.) She was thus not disabled from June 25, 2005 until March 31, 2007. (R. 20.)

## LEGAL STANDARD

A court should uphold the final decision of the Commissioner "if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates* v. *Colvin*, 736 F.3d 1093, 1097-98 (7th Cir. 2013) (citing 42 U.S.C. §405(g); *Jelinek* v. *Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)).[9] "Substantial evidence" has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson* v. *Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consolidated Edison Co.* v. *NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). A court may not "reweigh the evidence or substitute [its] own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, [it] must

---

[9]    The Act provides, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).

uphold the decision under review." *Shideler* v. *Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The

ALJ's decision, however, must rest on "adequate evidence contained in the record and must

explain why contrary evidence does not persuade." *Berger* v. *Astrue*, 516 F.3d 539, 544 (7th Cir.

2008). The ALJ must "build a logical bridge from the evidence to his conclusion, but he need

not provide a complete written evaluation of every piece of testimony and evidence." *Shideler*,

688 F.3d at 310 (quoting *Schmidt* v. *Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). "If a decision

'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand

is required." *Kastner* v. *Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele* v. *Barnhart,*

290 F.3d 936, 940 (7th Cir. 2002)).

## ANALYSIS

To determine whether a claimant is disabled, and thus eligible for disability insurance

benefits, an ALJ uses a sequential five step inquiry. *See* 20 C.F.R. §§ 404.1520, 416.920;

*Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant is engaged in

substantial gainful activity. *See* 20 C.F.R. §§ 404.1520, 416.920. If so, the claimant is not

eligible for benefits. *See id.* At step two, the ALJ assesses whether the claimant has an

impairment of combination of impairments that are severe. *See id.* At step three, the ALJ

determines whether the impairment(s) meet or equal a listed impairment in the Social Security

regulations and thus preclude substantial gainful activity. *See id.*; 20 C.F.R. pt. 404, subpt. P,

app. 1. At step four, the ALJ analyzes the claimant's RFC to determine whether the claimant can

perform his past relevant work. *See* 20 C.F.R. §§ 404.1520, 416.920. Finally, at step five, the

ALJ determines whether the claimant can perform other work considering the claimant's RFC,

age, education and experience. *See id.* "The process is sequential, and if the ALJ can make a

conclusive finding at any step that the claimant either is or is not disabled, then she need not

14

progress to the next step." *Young* v. *Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004). The claimant

bears the burden of proof at steps one through four, while the burden shifts to the Commissioner

at step five. *Briscoe ex rel. Taylor* v. *Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Spraags argues that the ALJ's decision must be reversed because (1) she failed to perform

a proper pain analysis and she misread medical evidence, rendering her decision "patently

wrong"; (2) she failed to provide good reasons for rejecting the opinion of Spraags' treating

physician; and (3) she posed a flawed hypothetical to the vocational expert because it did not

sufficiently include Spraags' limitations due to her pain.

## I.      Credibility Determination (Pain Analysis and Medical Evidence)

Spraags contends that the ALJ erred in finding that her complaints of pain lacked

credibility and in misreading the medical evidence in making her determination. (Dkt. 31 at

1124.) The court cannot easily overturn an ALJ's credibility finding. Because the ALJ is in the

best position to assess credibility, this assessment will only be reversed if it is "patently wrong."

*Powers* v. *Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The decision of an ALJ is patently wrong if

it provides no explanation or support for the decision. *See Elder* v. *Astrue*, 529 F.3d 408, 413-14

(7th Cir. 2008). Without such an explanation, courts cannot undertake any meaningful review

and should remand the case. *See Giles ex rel. Giles* v. *Astrue,* 483 F.3d 483, 487 (7th Cir. 2007).

An ALJ may not reject a claimant's testimony simply because it conflicts with medical evidence,

but he may consider any conflict in making a credibility determination. *See Moss* v. *Astrue*, 555

F.3d 556, 561 (7th Cir. 2009).

### A.      Failure to Consider Spraags' Testimony

Spraags first argues that the ALJ failed to consider all of the evidence, including the

claimant's subjective testimony of her symptoms as required by the social security regulations.

*See* SR 96-7p, 1996 WL 374186 (July 2, 1996). In assessing the claimant's credibility, the ALJ

should consider the entire record, including

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. "This [ruling] essentially requires an ALJ to "build an accurate and logical bridge from

the evidence to his conclusion." *Robinson* v. *Barnhart*, 233 F. Supp. 2d 1030, 1035 (N.D. Ill.

2002) (quoting *Clifford* v. *Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Spraags argues that the

ALJ did not give sufficient weight to her description of her symptoms, put too much weight on

Spraags' ability to live on her own, and drew inappropriate inferences regarding Spraags'

credibility.

Although Spraags testified that her pain and other symptoms were disabling, the social

security ruling on which Spraags relies does not state that the ALJ should take the claimant's

explanation of her symptoms as fact. Instead, "whenever the individual's statements about the

intensity, persistence, or functionally limiting effects of pain or other symptoms are not

substantiated by objective medical evidence, the adjudicator must make a finding on the

credibility of the individual's statements based on a consideration of the entire case record." SR

96-7p, 1996 WL 374186, at *2.

This is what the ALJ did. She considered that Spraags said her pain worsened from 2005 until 2007 (R. 13), that she had painful shoulder spasms twice per week (*id.*), that medications she took made her sleepy (*id.*), that the spasms caused stiffness that woke her from sleep (R. 13-14), and that she could not pick up coins with her left hand (R. 14). The ALJ noted Spraags' Naprosen, Flexeril, and Vicodin prescriptions, among others, throughout the opinion. (R. 15.)

After considering this evidence, the ALJ gave specific reasons for her finding that Spraags' "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with" RFC. (R. 12.) First, the ALJ cited inconsistencies between Spraags' subjective complaints of pain and her physicians' records. For example, Dr. Patil reported that Spraags was able to pick up coins with her left hand on February 21, 2006. (R. 14.) Also, Spraags' contemporaneous statements to her physicians were not consistent with her statements at the hearing. While she told Dr. Patil in February 2006 that she had "mild to moderate pain" (R. 532), she testified at the hearing that her pain from 2005 until 2007 was a ten out of ten. (R. 13.) Second, Spraags sought medical treatment without mentioning her shoulder pain. For example, Spraags was treated in the emergency room at Oak Forest Hospital on April 17, 2007 (one week prior to visiting the pain clinic at Stroger Hospital) but only complained of left knee pain and a bump under her left ear. (R. 16.)

Spraags also argues that the ALJ "incorrectly summarized Plaintiff's testimony regarding her pain medication." (Dkt. 31 at 11.) In particular, she takes issue with the ALJ's statement that there were "gaps" during which Spraags did not refill her medications. The court cannot find, however, that the ALJ was incorrect in this assessment. The ALJ relied on Spraags' pharmacy record, which does in fact show gaps in Spraags' refilling her Vicodin, Naprosyn, and Relafen. (R. 858-89.) For example, it shows that she was prescribed a seven-day supply of

Vicodin on August 18, 2005, with an allowance for one refill, but did not have the prescription refilled until February 17, 2006.  (R. 858.)

Thus, the ALJ did not simply dismiss Spraags' claims because they were inconsistent with medical evidence.  The ALJ was under no obligation to believe Spraags.  *See Johnson* v. *Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("Despite the inherent difficulty of evaluating testimony about pain, an administrative law judge will often have solid grounds for disbelieving a claimant who testifies that she has continuous, agonizing pain."); *see also Shideler*, 688 F.3d at 311-12.  The ALJ found that Spraags' own complaints that she made over the years were internally inconsistent, a determination that greatly affected the ALJ's credibility assessment.  This was not the type of "conclusory determination that SSR 96-7p prohibits" and that the Seventh Circuit has held to be insufficient.  *Brindisi ex rel. Brindisi* v. *Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (rejecting ALJ's credibility determination that consisted of two sentences with no explanation or support).  Here, the ALJ provided adequate explanation to "allow this court to understand the weight" that she gave to Spraags' statements and her other conclusions.  *Id.* at 788.  The ALJ did not "disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record."  *Moss*, 555 F.3d at 561.  Instead, the ALJ used inconsistencies in Spraags' testimony with her previous statements and medical record to build a logical bridge to her conclusion.

Spraags next contends that the ALJ overstated Spraags' daily activities by considering only the fact that she lived alone and could do light laundry instead of recognizing that Spraags' family helped her with chores and that her mother often stayed with her or Spraags would stay with her mother.  "[A] person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."

*Schreiber* v. *Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013) (citing *Roddy* v. *Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Moss*, 555 F.3d at 562). But where an ALJ does "not place undue weight" on a claimant's daily living activities and provides other valid reasons for finding the claimant not credible, an ALJ's credibility determination should be upheld even if it "was not perfect." *Schreiber*, 519 F. App'x at 961.

Here, the ALJ acknowledged Spraags' testimony that her family and friends helped with cooking and food shopping but also explained that Spraags admitted "she was able to live alone, and do laundry a little." (R. 13.) Although this does not take into account all of Spraags' stated limitations, it is far from the only reason that the ALJ found Spraags not to be credible. The ALJ noted several times that she considered the opinions of the doctors who conducted the functional capacity evaluations, as well as Spraags' past medical history and prescription medication history. The ALJ thus provided a sufficient basis for her adverse credibility termination. *See Schreiber*, 519 F. App'x at 961.

### B.     Consideration of Spraags' Medical Treatment

Spraags also argues that the ALJ erred by relying on the fact that Spraags sought little medical treatment during the relevant period. The Seventh Circuit has consistently held that "[i]n assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft* v. *Astrue,* 539 F.3d 668, 679 (7th Cir. 2008) (citing SSR 96-7p, 1996 WL 374186, at *7). "Similarly, the Social Security regulations permit the ALJ to consider a claimant's treatment history, and failure to seek medical attention or follow a pain management regimen." *Rogers* v. *Colvin*, No. 12 C 3134, 2014 WL 1647087, at *13 (N.D. Ill. Apr. 24, 2014). But an ALJ "'must not draw any inferences' about a claimant's condition from this failure unless

the ALJ has explored the claimant's explanations as to the lack of medical care." *Moss*, 555 F.3d at 562 (quoting *Craft*, 539 F.3d at 679).

Spraags explained that she did not seek consistent treatment because "at some point during the relevant period she lost her insurance" and that she tried to go to a public clinic but she was told she would have to wait seven to eight months for an appointment. (Dkt. 31 at 12 (citing R. 46-48).) At her hearing, she explained that "at one point I didn't have insurance for about six or seven months." (R. 46.) She also notes that after four physical therapy sessions the therapist determined that Spraags had attained "maximum potential with therapy at this time." (R. 554.)

The ALJ considered Spraags' explanation for her inconsistent treatment. She explained that Spraags testified that she did not have follow-up visits with an orthopedic physician from 2005 until 2007 because she had no insurance. (R. 14.) But the ALJ also noted that Spraags knew she could take advantage of free medical care through the Cook County healthcare system at hospitals such as Provident. (*Id.*) She could also go to the emergency room for treatment, which Spraags testified she knew she could do. (R. 47.) Even though Spraags testified that she could not obtain an appointment at a clinic while she did not have insurance, there were other options available to her. *See, e.g., Hedrick* v. *Astrue*, No. 1:08-CV-312, 2009 WL 3246675, at *10 (N.D. Ind. Oct. 6, 2009) (ALJ adequately considered claimant's statement that he did not seek medical care due to lack of insurance where ALJ clearly mentioned lack of insurance in opinion, considered medical records, and where claimant's attorney did not directly introduce evidence of claimant's inability to pay); *cf. Gardner* v. *Barnhart*, No. 02 C 4578, 2004 WL 1470244, at *16 (N.D. Ill. June 29, 2004) (ALJ did not err by considering claimant's failure to seek medical even though claimant explained this failure was due to lack of insurance and

money).  Moreover, Spraags testified that she was only without insurance for six or seven months.  (R. 46.)  This does not explain why she failed to aggressively pursue treatment—not necessarily through physical therapy, but in the form of more doctor's visits or requesting different medications—at other points in the relevant period.  The ALJ thus did not err in considering Spraags' minimal orthopedic treatment.

### C.    Reliance on Dr. Savage's Opinion

Spraags also takes issue with the ALJ's reliance the opinion of Dr. Savage, the testifying medical expert.  She points to the fact that Dr. Savage relied on Spraags' March 2009 MRI, which showed no abnormality, as opposed to the April 2009 MRI, which showed a five millimeter tear of the insertion of the supraspinatus tendon.

As an initial matter, both MRIs are from two years outside of the relevant time period and thus are of little value.  It was Spraags' "burden to produce medical evidence to support her claim of disability *prior* to her date last insured."  *Milliken* v. *Astrue*, 397 F. App'x 218, 225 (7th Cir. 2010) (emphasis added) (citing *Eichstadt* v. *Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)).  While evidence from the April 2009 MRI may suggest that Spraags was disabled at the time of the hearing, it does not support a finding that an MRI taken within the relevant two year period would have shown a tear.  *Eichstadt*, 534 F.3d at 668.  The ALJ was not incorrect in relying on Dr. Savage's opinion even though Dr. Savage did not have the opportunity to examine the April 2009 MRI.

Moreover, Dr. Savage did not base his entire opinion on the fact that the March 2009 MRI was normal, but he also relied heavily on Dr. Patil's notes and considered Dr. Mundackal's opinion, but found it unpersuasive.   Further, the ALJ did not ignore the second MRI, as Spraags asserts.  The ALJ explicitly referred to the April 2009 MRI that showed the five millimeter tear.

(R. 17.)  This was despite the fact that Spraags submitted this record to the ALJ after the hearing (precluding Dr. Savage's review).

The court thus finds that the ALJ was not "patently wrong" in the credibility assessment that she made regarding Spraags.

## II.    Reasons for Rejecting the Opinion of Spraags' Treating Physician

Spraags next argues that the ALJ did not provide good reasons for rejecting the opinion of Spraags' treating physician, Dr. Mundackal.  The opinion of a treating physician will be controlling where it is well-supported by medical findings and it is not inconsistent with other substantial evidence.  *See Bauer* v. *Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien* v. *Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).  If those two conditions are met, then the ALJ cannot refuse a treating physician's opinion.  *Id.*  If contradictory evidence exists, however, the opinion of the treating physician simply becomes one more piece of evidence to consider.  *Id.*  If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider the length, nature, and extent of the treatment relationship, as well as the consistency and supportability of the physician's opinion, among other factors.  *Moss,* 555 F.3d at 561 (citing   20 C.F.R. § 404.1527(c)(2)).

In general, the more evidence a medical source presents in support of an opinion, the more weight it will be given. 20 C.F.R. § 404.1527(c)(3); *see also Givens* v. *Colvin*, -- Fed. App'x ----, No. 13-2000, 2013 WL 6623179, at *6 (7th Cir. Dec. 17, 2013).  Opinions will also be given more weight where they are more consistent with the record as a whole.  20 C.F.R. § 404.1527(c)(4).  As the Seventh Circuit has explained, although a treating physician's opinion may be more informed because he has greater familiarity with the patient, having treated him over time, *Schmidt*  v. *Astrue*, 496 F.3d 833, 842 (7th Cir. 2007), the treating physician may

"bend over backwards to assist a patient in obtaining benefits," *Punzio* v. *Astrue,* 630 F.3d 704, 713 (7th Cir. 2011) (quotation marks and citations omitted), and "too quickly find disability." *Dixon* v. *Massanari,* 270 F.3d 1171, 1177 (7th Cir. 2001) (quotation marks and citation omitted).

The ALJ considered the RFC questionnaire that Dr. Mundackal completed for Spraags on January 12, 2007 but gave the opinion "less than controlling weight." (R. 17.) She did not err in this decision. In making her determination, the ALJ reasoned that (1) the assessment was based on a single visit; (2) there was no objective testing done at the time of the visit; (3) the medical evidence of record did not support the assessment; (4) the assessment contradicted some of Spraags' testimony; and (5) the assessment was inconsistent with Dr. Mundackal's own treatment notes. (R. 17-18.) Because of Dr. Mundackal's short relationship with Spraags and because her assessment was inconsistent with other evidence on the record, the ALJ gave Dr. Mundackal's opinion appropriate weight.

Regardless, Spraags has multiple complaints about the ALJ's decision, none of which succeeds. First, despite Spraags' protestations, the ALJ did explain what weight she was giving to the opinion: "less than controlling weight." The Seventh Circuit has expressly held that an ALJ may simply state he is giving a controlling physician's opinion "less than controlling" or "not controlling" weight so long as the ALJ explains why she is doing so. *See Manley* v. *Barnhart*, 154 F. App'x 532, 536 (7th Cir. 2005) ("We can find no case holding that an ALJ who explains the basis for disfavoring a treating physician's opinion must also state precisely how much weight—beyond 'not controlling'—he places on it.").

Second, Spraags argues that the ALJ was incorrect in giving little weight to Dr. Mundackal's opinion. But the ALJ explained she did so because it was based on just one visit at which no objective testing was done. (R. 17.) This is an appropriate basis for discounting the

opinion. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."); *see also Presser* v. *Colvin*, No. 1:12-cv-835, 2013 WL 5309889, at *8 (S.D. Ind. Sept. 23, 2013) (even though ALJ overlooked evidence of claimant's treating relationship with physician, ALJ did not commit reversible error because relationship only consisted of one brief visit for a medication follow-up).

Third, Spraags argues that the ALJ ignored evidence regarding her pain and symptoms that is consistent with Dr. Mundackal's assessment, and points to evidence of her complaints of pain, notations of decreased range of motion, repeated references to pain medication, and failed treatments. (Dkt. 31 at 13.) But the ALJ did not ignore this evidence, as explained throughout this opinion. Instead, the ALJ viewed the record as a whole, which is what she was required to do, in deciding to give less than controlling weight to Dr. Mundackal's opinion. The ALJ noted that Dr. Mundackal's opinion was inconsistent with some of Spraags' testimony. (R. 18.) For example, Dr. Mundackal's assessment notes that Spraags does not have significant limitations with reaching, handling, or fingering[10] (R. 581), whereas Spraags testified that from 2005 until 2007, she had significant problems manipulating her left hand and could not pick up coins, type, or button buttons.[11] (R. 52-53.)

---

[10] This finding is consistent with Dr. Patil's assessment from February 2006. (R. 534.)

[11] Spraags argues that the ALJ erred by both rejecting Dr. Mundackal's opinion and using it to find Spraags not credible. But this case is unlike those where the ALJ chooses to "select and discuss only that evidence which favors his or her ultimate conclusion." *Bailey* v. *Barnhart*, 473 F. Supp. 2d 822, 836 (N.D. Ill. 2006) (remanding to Commissioner where ALJ rejected all RFC medical evidence and formulated her own physical assessment); *see also Myles* v. *Astrue*, 582 F.3d 672, 678 (7th Cir. 2008) (remanding to Commissioner where ALJ accepted certain portions of treating physician's report but refused to accept his conclusions). Instead, the ALJ here properly considered the entire record, decided how much weight to give to various medical opinions, and then made her conclusions. Thus, the fact that the ALJ gave Dr. Mundackal's opinion less than controlling weight and also found it inconsistent with Spraags' testimony is not a reason to remand this case.

The ALJ also explained that Dr. Mundackal's assessment from January 2007 is inconsistent with his notes from a July 2007 visit at which Spraags denied complaints (but did have prescriptions refilled). (R. 749.) This denial is consistent with other medical records from 2007. For example, after a car trip to Mississippi during the summer of 2007, she sought treatment not for her shoulder and back but for leg swelling. (R. 687.) The ALJ was entitled to take into account that Spraags did not consistently tell her physicians she was in pain even though she testified at the hearing that she was in constant pain, and the fact that Spraags denied any complaints at some visits. *See, e.g., Simila* v. *Astrue*, 573 F.3d 503, 518 (7th Cir. 2009) (affirming district court's decision to uphold ALJ's determination that claimant was not credible where, *inter alia*, doctors found that claimant had normal, pain-free range of motion); *Rogers*, 2014 WL 1647087, at *9 ("[W]hile [the treating physician's] report notes abnormal gait, muscle spasms, and weakness, none of these conditions are mentioned in his treatment notes. Prior inconsistencies like these bear on credibility.").

Fourth, Spraags argues that the ALJ erred in "cherry-picking" which residual function assessments to consider, choosing to consider one from 2004 (one year before the relevant time period began) but refusing to consider one Dr. Mundackal conducted on June 5, 2009, because it was two years after the relevant time period. (R. 866-70.) The ALJ was under no obligation to consider the evaluation, as it was from after the relevant time period. *See Eichstadt*, 534 F.3d at 668. Moreover, the ALJ's consideration of the 2004 evaluation and not the 2009 evaluation was harmless because the 2009 evaluation would not provide the ALJ with any reason to change her assessment. *See McKinzey* v. *Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (ALJ's harmless error did not merit remand, which "would be a waste of time and resources for both the Commissioner and the claimant"). First, the ALJ did consider evaluations and medical opinions from in or just

after the relevant time period that were consistent with the ALJ's ultimate determination. (*See, e.g.,* R. 16 ("Interestingly, the claimant participated in another functional capacity evaluation in April 2007, which released her to light duty work with permanent shoulder limitations as well."); R. 17 (giving "significant weight" to residual functional capacity assessment performed by Dr. Young-Ja in 2006 that found Spraags could stand and/or walk a total of six hours in an eight-hour work day and sit a total of six hours in an eight-hour work day, and could not climb ladders, ropes, or scaffolds).) Second, Dr. Mundackal's 2009 evaluation, like the 2007 evaluation, is internally inconsistent. The evaluation indicates that Spraags can sit for more than two hours at a time (R. 867), that she can only sit for one hour at a time (R. 871), and that she can sit for less than two hours total in a work day (R. 868). Third, this evaluation actually shows some improvements from Dr. Mundackal's original January 2007 residual functional capacity assessment. For example, the January 2007 assessment states that Spraags can never lift any weight on an occasional or frequent basis (R. 577) but the June 2009 report states that she can lift five pounds on an occasional and frequent basis (R. 871), although neither report specifies which arm is at issue in this question. Additionally, in both the 2007 and 2009 reports, Dr. Mundackal comes to the conclusion that Spraags is capable of a low stress job. (R. 579, 867.)

Finally, "[a]n ALJ [ ] may discount a treating physician's medical opinion if the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'" *Schmidt*, 496 F.3d at 842 (quoting *Skarbek* v. *Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)). Dr. Mundackal's January 12, 2007 report is internally inconsistent. For example, the report indicates both that Spraags can both sit and stand for two hours at a time (R. 577), but also that she can sit for only thirty minutes at a time and stand for

only 20 minutes at a time. (R. 579.) It also indicates that Spraags can sit and stand for a total of four hours in a work day (R. 577) and that she can only sit for a total of two hours and stand for a total of less than two hours (R. 580). Although the ALJ did not directly address this inconsistency, the court will not "remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result." *McKinzey* 641 F.3d at 892. As explained throughout this opinion, the ALJ sufficiently explained her reasons for rejecting evidence of disability. For all of these reasons, the ALJ did not err by giving less than controlling weight to Dr. Mundackal's opinion.

## III.  Hypothetical to the Vocational Expert

Spraags' final argument is that the ALJ presented a flawed hypothetical to Dr. Hammersmith, the vocational expert. The vocational expert must understand the full extent of an applicant's disability so he does not declare the applicant capable of performing work that the applicant cannot truly perform. *See Young*, 362 F.3d at 1003. "If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto* v. *Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). "However, there is an exception to this general rule for cases where the VE independently learned of limitations, such as through questioning at the hearing." *Lopez* v. *Astrue*, No. 10 C 8042, 2012 WL 1030481, at *9 (N.D. Ill. Mar. 27, 2012) (citing *Steele*, 290 F.3d at 942; *Ragsdale* v. *Shalala*, 53 F.3d 816, 818-821 (7th Cir. 1995)).

Spraags argues that the residual functional capacity limitations the ALJ presented to Dr. Hammersmith were flawed because they did not take into account the side effects of Spraags' pain medications and her need to take approximately four sick days per month, which Dr. Mundackal found in the January 2007 residual function capacity exam. But "[t]his contention

27

merely regurgitates [p]laintiff's credibility and [residual functional capacity exam] arguments, which the [c]ourt has addressed." *Pakhotama* v. *Colvin*, No. 10 C 5379, 2013 WL 2151505, at *9 n.7 (N.D. Ill. May 16, 2013) (affirming denial of benefits). "[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Simila*, 573 F.3d at 521 (quoting *Schmidt*, 496 F.3d at 846). The ALJ here found that Spraags' pain was less debilitating than described by Dr. Mundackal in her January 2007 report, and also that there were large gaps in Spraags' prescription history. (R. 16-18.) She included in her hypothetical Spraags' limitations in reaching and lifting, her sitting and standing limitations, and the need to avoid hazards. (*See* R. 74-77.) Moreover, the vocational expert was present throughout the hearing and was aware of Spraags' testimony regarding her disability. (R. 73.) The court finds that the ALJ incorporated Spraags' credible limitations and that the hypothetical was not flawed.

## CONCLUSION AND ORDER

For the foregoing reasons, Ms. Spraags' motion for summary judgment (dkt. 30) is denied, and the Commissioner's cross-motion (dkt. 34) is granted. The Clerk is directed to enter judgment in favor of the Commissioner. The case is terminated.

Date:   May 21, 2014